[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs seek money damages for injuries alleged to arise from exposure to lead-based paint in and upon premises rented to the plaintiffs by the defendant. Judgment by default for failure to appear entered against the defendant and the plaintiffs presented evidence as to damages.
Under our practice, entry of a default is considered an admission by the defendant of the truth of the facts alleged by the plaintiffs in their complaint. However, the plaintiffs still must prove what damages they are entitled to receive. Notwithstanding being charged with that burden of proof, at the threshold, plaintiffs still are entitled to nominal damages. DeBlasio v. Aetna Life Casualty Co., 186 Conn. 398, 400-401. Citations omitted.
The relevant facts are that the plaintiff Gwendolyn Dickerson and her minor child, plaintiff Stephanie Dickerson, became tenants of a third floor apartment rented to them by the defendant pursuant to a month-to-month lease. Occupancy of the third floor of the three family dwelling owned by the defendant began on or about May 1, 1987 and continued until April 1, 1988. The minor child was born November 11, 1984 and was approximately two and one-half years old when this tenancy began. On December 19, 1986, a routine physical examination, including an initial serum lead screen, revealed that, at two years of age, the minor child had a blood lead level of 13 micrograms per deciliter (13 ug/dl). At that point in time, the federal Center for Disease Control (CDC) deemed a toxic level to be 25 ug/dl. Subsequent to that date and prior to the hearing on October 1, 1991, the CDC revised the level deemed toxic to 10 ug/dl. Preventing Lead Poisoning in Young Children, Statement (4th Rev. CDC — Oct. 1991).
During the course of a physical examination on August 21, 1987, the minor plaintiff tested at 30 ug/dl. This was eight months after the initial serum lead screen and three and one-half months after beginning the occupancy at issue here. No evidence was submitted by the plaintiffs as to the minor plaintiff's condition of general health and her physical surroundings during the four and one-half month period from the initial discovery of the presence of the toxic lead in her blood to the commencement of the CT Page 5165 occupancy on May 1, 1987. The court is therefore asked to infer, absent any foundation, that the elevated lead blood level, from 13 ug/dl to 30 ug/dl occurred solely as a result of the minor plaintiff's residing at the subject premises.
A third test was performed on September 28, 1987 and a lead blood level of 33 ug/dl was reported. The lead blood levels were evaluated and incorporated into the plaintiffs neuropsychological findings and report of Armin Paul Thies, Ph.D., a Board Certified Clinical Neuropsychologist, who examined and tested the minor plaintiff. On October 21, 1987 approximately three weeks later, she again was tested and her blood lead level had decreased, somewhat, to 27 ug/dl. No evidence was submitted as to the minor plaintiff's general health, including her neuropsychological condition, as a result of her documented lead poisoning, sustained prior to occupancy of the defendant's premises.
Further evidence established that the subject premises, occupied by three families living independently of one another, had been inspected by the City of New Haven Health Department and, as a result, the defendant was ordered, in writing, on April 2, 1986 "to remove all lead paint from doors, doorjambs, and windows up to the height of five (5) feet above the floor and to remove all chipped and flaking paint to the base surface." The inspection had uncovered the presence of paint containing an amount of lead determine to be greater than six one hundredths of one percent (0.06%) by weight on both exterior and interior surfaces of the dwelling, including the following locations: "entryway doorjamb (dark green); living room window track (yellow); bath wall (white); living room ceiling (white); and rear hallway ceiling (yellow)." None of these carefully detailed areas are referenced as to which of the three independent dwelling units they apply. In light of the default against the defendant, the court must assume that the areas included the demised premises.
The defendant failed to remove the lead-based paint prior to renting the third floor apartment to the plaintiffs and failed and refused to inform plaintiffs, prior to occupancy, of the hidden defect which constituted a dangerous and hazardous condition and was a violation of the New Haven Code of Ordinances, 16-50 and of General Statutes, 21a-82 (a) and 47a-8, prohibiting the use of leadbased paint in multi-family dwellings such as the one owned by the defendant. At no time relevant hereto did the plaintiffs paint or cause to be painted the demised premises.
Upon discovery of the minor child's elevated lead blood levels, paint samples from the premises were collected by inspectors from the City of New Haven Bureau of Environmental Health and laboratory analysis was conducted by the State Department of Health on December 28, 1987 and again on May 11, 1988. As a result of the CT Page 5166 December laboratory tests, the City of New Haven ordered the defendant, on January 19, 1988, to remedy the dangerous condition found to exist in the presence of lead-based paint containing more than 0.06% lead by weight. Three days later, on January 22, 1988, the City of New Haven Department of Health notified the plaintiffs of the existence of lead paint on the premises. Notwithstanding the three serum blood screens in 1987, each of which revealed lead blood levels elevated over the 13 ug/dl found in 1986, the plaintiffs maintain that the 1988 notice from city officials "was the first confirmation . . . of the existence of lead-based paint at the premises.
In order to establish damages, the plaintiffs presented the testimony of Dr. Thies and his Neuropsychological Report concerning the evaluation and testing of the minor plaintiff was entered into evidence as Exhibit C. Moreover, the mother testified as to her observations of the child during and after the termination of the tenancy. Although the mother observed her daughter to be hyperactive and to have had difficulty concentrating with a loss of appetite before and during occupancy of the third floor apartment, no evidence was offered as to the child's condition of general health during the period between the initial finding of lead in the blood in December, 1986 end the beginning of the term of occupancy.
The plaintiff testified that her daughter's condition "improved" after leaving the premises on April 1, 1988. Since lead poisoning, particularly in young children, has been documented as a cause of impaired cognitive functioning, Dr. Thies conducted extensive assessment procedures in order to determine the extent, if any, of "loss of cognitive functioning as the result of [plaintiffs] ingestion of lead."
Dr. Thies concluded that:
 "Stephanie shows a variability in performance levels across tests, which is not uncommon for children her age. In general, scores range for (sic) low average to superior. However, there does not appear to be a pattern of even relative deficiency compared to above average to superior intellectual potential. The isolated instances of mildly impaired performance are not interpretable within the matrix of test findings. Therefore, this evaluation does not document any cognitive loss that can be attributed to ingestion of lead. It should be understood that lead ingestion causes documented cognitive loss in children and that such loss is not consistent from child to child. The negative findings of this evaluation do not CT Page 5167 rule out functional loss of any sort or of any degree. However, the evaluation does document that any effects of her lead ingestion have not had a measurable impact on her functioning at this time. Her development in the future may be significantly affected, however, that cannot be determined at this time and would have to occur in ways that cannot be predicted from the present findings."
While, ordinarily, a default entitles a plaintiff to recover nominal damages, the right to recover substantial damages requires a showing of actual, as opposed to a mere technical injury. Mackin, op. cit. at 190. Fortunately for the child involved, even assuming a technical injury, the evidence clearly fails to establish any harm. "Although there are no handy conversion tables with which to monetize personal injury and inconvenience, however substantial, it is self evident that minimal inconvenience can result in only nominal damages." Mackin, op. cit., at 191.
The evidence offered by the plaintiffs failed to establish any inconvenience suffered by the plaintiffs other than, perhaps, the serum lead screens conducted in 1987. Even so, these were done in the course of periodic check-ups following the 1985 discovery of a blood lead level unrelated to the events of this case.
In a second count of the complaint, the plaintiffs have alleged that the defendant's concealment of and failure to remedy the known latent hazardous and unlawful condition of lead-based paint in an amount violative of the statute, was an unlawful and deceptive practice which constituted a violation of General Statutes,42-110a et seq., the Connecticut Unfair Trade Practices Act. The court agrees. Again, however, in assessing damages, the court is bound by the evidence. There is plainly a lack of any "ascertainable loss." No claim was made of any loss of time from school or work or any other life activities, nor of any diminution of potential. Any award for the established fluctuations in lead blood levels, absent any showing of harm, would be nothing more than speculative, based, perhaps in part, upon natural feelings of sympathy for a child so young placed so much at risks presently beyond her power to avoid.
The plaintiffs seek, by way of relief, money damages, punitive damages and "Attorney's fees pursuant to Connecticut General Statutes [42-110a, et seq.]." The evidence presented at the hearing in damages did not lay a foundation for an award of punitive damages and none, therefore, are awarded. The rules governing the award of punitive damages state:
"Punitive damages are awarded when the evidence CT Page 5168 shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . If awarded, they are restricted to cost of litigation less taxable costs of the action being tried and not that of any former trial. . . . Further, for an award of punitive damages it is essential that evidence of the cost of the litigation of the case being tried must be offered." Vandersluis v. Weil, 176 Conn. 353, 358-59 (1978); See, Alaimo v. Royer, 188 Conn. 36, 42 (1982).
Judgment for the plaintiffs may enter in the amount of one dollar ($1.00) nominal damages, together with costs in the amount of $1,380.00 for the neuropsychological evaluation, counsel fees in the sum of $1,000.00 and taxable costs.
THE COURT
LEANDER C. GRAY, JUDGE